**TA Legal Group PLLC**
Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 E Main Street, Suite 3-2
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com
*Attorneys for Plaintiff Bryan*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK BRYAN,<br><br>Plaintiff,<br><br>- against -<br><br>M&T BANK CORPORATION, MANUFACTURERS AND TRADERS TRUST COMPANY d/b/a M&T BANK & EILEEN CONNORS,<br><br>Defendants. | **Case No.:**<br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, Mark Bryan ("Plaintiff" or "Bryan"), by and through his undersigned counsel of record, TA Legal Group PLLC, hereby files this Complaint against Defendants M&T BANK CORPORATION, MANUFACTURERS AND TRADERS TRUST COMPANY d/b/a M&T BANK ("M&T" or the "Bank") and Eileen Connors ("Connors") (collectively, "Defendants"), and alleges as follows:

1

## **INTRODUCTION**

1.    Plaintiff Bryan is a Black man with Type II diabetes who banked at M&T's Great Neck branch for approximately a decade without incident. For nearly all of that time, M&T allowed him (like other customers of the branch) to use the restroom. On February 19, 2026, that changed the moment Bryan disclosed why he needed the restroom. The branch manager, Defendant Eileen Connors, refused him access, invoking a "company policy" that had never before been enforced against him.

2.    Bryan complained to M&T's corporate office and filled out an incident questionnaire for the New York State Division of Human Rights. Six weeks later, while at the Great Neck Branch, Bryan learned that M&T closed every account and limited access to the credit lines he held with the Bank, including a personal account, three business accounts, and three lines of credit. M&T did so without meaningful notice and without a signed or dated explanation.

3.    The tellers could not assist Bryan so he asked Connors where his money had gone. Connors told him she could not help him and that he needed to "handle this yourself." A security guard then threatened to call the police when Bryan tried to document the encounter.

4.    The closures cut off Bryan's access to his own funds for weeks, disrupted three businesses that depended on that banking relationship, cost him the profit of a $210,000 real-estate sale, and damaged the personal and business credit he relies on every day. This action seeks to hold M&T and Connors accountable for that conduct under the Americans with Disabilities Act, 42 U.S.C. § 1981, the Equal Credit Opportunity Act ("ECOA"), and the New York State Human Rights Law.

**CLAIMS**

5. Plaintiff seeks declaratory and injunctive relief against M&T under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, based on M&T's refusal to make a reasonable modification to accommodate his disability.

6. Plaintiff seeks declaratory and injunctive relief against M&T under the ADA's anti-retaliation and interference provisions, 42 U.S.C. § 12203, based on M&T's retaliatory closure of his accounts and credit lines and its interference with his exercise of rights protected by the ADA.

7. Plaintiff seeks compensatory damages for his economic injuries, together with declaratory and injunctive relief, attorneys' fees, and costs against M&T under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, based on M&T's denial of a reasonable modification to accommodate his disability, and its retaliatory conduct, in a program or activity receiving federal financial assistance.

8. Plaintiff seeks compensatory and punitive damages against M&T and Connors under 42 U.S.C. § 1981 for race discrimination and retaliation affecting his contractual banking relationships.

9. Plaintiff seeks actual and punitive damages against M&T under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., for race discrimination in the termination, revocation, or restriction of his existing lines of credit.

10. Plaintiff separately seeks actual damages, statutory punitive damages, declaratory and equitable relief, attorneys' fees, and costs against M&T under the Equal Credit Opportunity Act and Regulation B, 15 U.S.C. § 1691(d) and 12 C.F.R. § 1002.9, based on M&T's failure to provide a timely and compliant notice stating the specific reasons for the adverse action taken against his lines of credit.

11.    Plaintiff seeks compensatory damages against M&T and, as to certain claims, Connors, under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., for disability and race discrimination, retaliation, aiding and abetting, and discrimination in credit transactions.

12.    Plaintiff seeks compensatory and consequential damages against M&T for breach of the implied covenant of good faith and fair dealing in the administration and termination of his accounts and credit relationships.

## JURISDICTION AND VENUE

13.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ADA, 42 U.S.C. § 1981, and the ECOA.

14.    This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as Plaintiff's federal claims.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, including at M&T's branch located in Great Neck, New York, in Nassau County, where Connors was employed at all relevant times.

16.    This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and N.Y. C.P.L.R. § 301. M&T transacts substantial business in New York and operates the Great Neck branch in this District from which Plaintiff's claims arise. Connors was employed as the manager of that branch, and the conduct giving rise to Plaintiff's claims against her occurred in this District. Defendants therefore purposefully transacted

business and engaged in the challenged conduct within New York, and Plaintiff's claims arise directly from those activities.

**PARTIES**

**Plaintiff**

17.    **PLAINTIFF Mark  Bryan** is a Black man and, at all relevant times, a resident of Kings County, New York.

18.    For approximately a decade prior to the events described in this Complaint, Bryan maintained a substantial and continuous banking relationship with M&T, centered on its Great Neck Branch. At the time of the events described herein, that relationship included a personal deposit account, three business deposit accounts, and three lines of credit.

19.    At all relevant times, Bryan owned and operated four business entities (collectively, the "Businesses"):

a.    **Bryan Auto Wholesalers**, a New York incorporated company engaged in the wholesale purchase and resale of motor vehicles;

b.    **Sandspoint Auto Sales**, a New York incorporated company engaged in the wholesale purchase and resale of motor vehicles;

c.    and **Westport Holdings**, a New York incorporated company engaged in the acquisition, holding, and sale of real property.

20.    Bryan is the sole member of each of the Businesses and owns 100% of the equity interest in each. He is the sole managing member of each, exercises exclusive control over each, and is the only individual authorized to transact on each Business's financial accounts.

21.    Bryan personally applied for, negotiated, and obtained each of the lines of credit described in this Complaint. M&T underwrote and priced each line of credit by reference to Bryan's personal credit profile and his overall personal and business deposit relationship with

5

the Bank. Bryan is a named party, signatory, and directly liable obligor on each of the credit agreements and promissory notes governing those lines of credit, and he is personally liable for the amounts outstanding on each. He is likewise a named party and the sole authorized signatory on each of the deposit account agreements described in this Complaint.

22.    Bryan therefore holds contractual rights, in his own name and on his own behalf, under each of the deposit account agreements and credit agreements at issue in this action. The rights he asserts under 42 U.S.C. § 1981 are his own rights under contracts to which he is himself a party, and not rights belonging solely to a separate corporate entity. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476-77 (2006).

23.    At the time of the events described in this Complaint, Bryan's banking relationship with M&T consisted of one personal deposit account held in his individual name, three business deposit accounts, and three lines of credit.

24.    Each of the Businesses is wholly owned and controlled by Bryan, who is Black, and each is publicly identified with him. Each Business accordingly holds an imputed racial identity for purposes of 42 U.S.C. § 1981, and each is an "applicant" within the meaning of the Equal Credit Opportunity Act and Regulation B. *See* 12 C.F.R. § 1002.2(e).

**Defendants**

25.    **DEFENDANT M&T Bank** is a banking corporation authorized to do business in New York that operates numerous branches in this District, including the Great Neck branch, located at 23-25 North Station Plaza, Great Neck, NY 11021, described in this Complaint.

26.    At all relevant times, M&T was a "public accommodation" within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F); a "person" within the meaning of 42 U.S.C. § 1981; a "creditor" within the meaning of the Equal Credit Opportunity Act, 15 U.S.C. § 1691a(e); and a "person," "creditor," and place of "public accommodation" within the meaning

of the New York State Human Rights Law, N.Y. Exec. Law §§ 292(9), 296, and 296-a, and was and is therefore subject to each of the statutes under which it is sued in this Complaint.

27.    **DEFENDANT Eileen Connors** was, at all relevant times described in this Complaint, the Branch Manager of M&T's Great Neck branch. She is sued in her individual capacity for her personal participation in the conduct alleged herein.

28.    At all relevant times, Connors was a "person" within the meaning of 42 U.S.C. § 1981 and N.Y. Exec. Law § 296(6), and was and is therefore subject to individual liability under those statutes for her personal participation in the discriminatory and retaliatory conduct alleged herein.

<u>**CONDITIONS PRECEDENT TO SUIT**</u>

29.    Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, the ADA's anti-retaliation provision, 42 U.S.C. § 12203, 42 U.S.C. § 1981, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, do not require Plaintiff to exhaust any administrative remedy before commencing a private civil action, and Plaintiff has satisfied any prerequisite that does apply to those claims.

30.    Plaintiff is a qualified individual with a disability within the meaning of Title III of the ADA and the NYSHRL.

31.    Plaintiff did not file an administrative complaint with the New York State Division of Human Rights. Plaintiff submitted only a preliminary intake questionnaire concerning the February 19, 2026 incident. The questionnaire was not a verified administrative complaint, was not signed or filed under oath or declaration as a complaint pursuant to N.Y. Executive Law § 297(1), was not served upon Defendants, and did not result in the commencement or adjudication of an administrative proceeding. Accordingly, Plaintiff did not elect an

7

administrative remedy, and the election-of-remedies provision of N.Y. Executive Law § 297(9) does not bar his NYSHRL claims in this action.

32.    Plaintiff's claims against Connors are asserted under 42 U.S.C. § 1981 and the NYSHRL based on Connors's direct, personal participation in, and aiding and abetting of, the discriminatory and retaliatory conduct alleged herein in her capacity as the Branch Manager of M&T's Great Neck branch.

33.    Plaintiff has satisfied all conditions precedent to the institution of this action, or such conditions have been waived, excused, or otherwise satisfied. All claims asserted herein are timely, and all statutory, administrative, and procedural prerequisites to suit have been satisfied, waived, excused, or are otherwise inapplicable.

## STATEMENT OF FACTS

### Bryan's Decade-Long, Incident-Free Relationship With M&T's Great Neck Branch

34.    For approximately a decade prior to February 2026, Bryan maintained a substantial banking relationship with M&T, including a personal account, three business accounts, and three lines of credit that were central to his personal finances and business operations. That relationship also included an SBA-guaranteed loan that M&T originated and serviced in its capacity as a participating Small Business Administration lender. He regularly conducted business at the Great Neck branch and was well known to branch staff.

35.    Bryan's lines of credit with M&T were extended and serviced on terms that were a function of his overall deposit and banking relationship with the Bank. Among other terms, M&T permitted Bryan to service his business lines of credit by making interest-only payments, without any concurrent obligations to pay down the principal. Those interest-only terms were material to Bryan's businesses, which depend on predictable monthly debt service to finance vehicle inventory and operations.

36.     Bryan has Type II diabetes, a medical condition that can cause elevated blood glucose levels, which in turn cause frequent and, at times, urgent need to urinate. M&T's Great Neck branch employees, including prior branch management, knew that Bryan had Type II diabetes and that his need to use the restroom was connected to that condition.

37.     For approximately a decade before the events described in this Complaint, M&T permitted Bryan to use the restroom at the Great Neck branch when his medical condition required it. This access was routine and caused no known disruption, safety concern, or security incident.

38.     This practice was not unique to Bryan. He personally observed other customers of the Great Neck branch use the restroom while conducting business there. Axel Izquierda, a prior branch manager of the Great Neck branch, has confirmed by sworn affidavit that he established and/or knowingly permitted this practice for customers of the branch generally, **including customers who were not Black,** and not for Bryan alone.

## M&T Reversed a Decade of Practice the Moment Bryan Disclosed His Disability

39.     On February 19, 2026, Bryan visited the Great Neck branch to conduct banking business and asked to use the restroom because of his Type II diabetes, consistent with his practice for approximately the preceding decade. That request was for a disability-related modification protected under the ADA and the NYSHRL.

40.     Branch Manager Eileen Connors denied the request, telling Bryan that "company policy" did not allow customers to use the restroom. When he asked why the policy had changed after years of permitted access, Connors ignored him.

41.     Bryan then explained that he had Type II diabetes and needed the restroom because of his medical condition. Rather than reconsider, Connors became hostile and dismissive. She did not engage with him about his medical need, did not conduct any individualized assessment

9

of his request, did not offer any alternative accommodation, and did not identify any safety or security concern specific to him.

42.    Bryan completed his transaction, left the branch, and was forced to seek restroom access at a nearby business. He was humiliated and embarrassed by the manner in which he was treated.

**M&T Permitted Non-Black Customers To Use the Restroom and Denied Only Bryan**

43.    During the approximately ten years in which Bryan conducted business at the Great Neck branch, he regularly observed other customers use the branch restroom while conducting their banking. On multiple occasions, the customers he observed using the restroom were not Black.

44.    In that entire decade of regular patronage, the only customer Bryan ever observed being denied access to the restroom at the Great Neck branch was Bryan himself, a Black man. He never observed Connors, or any other M&T employee, deny restroom access to any non-Black customer.

45.    The employee who denied Bryan access, and who invoked a "company policy" that Bryan had never seen enforced against any customer in the preceding decade, was Connors, a white woman.

46.    M&T thus extended to non-Black customers the very restroom access it denied to Bryan. The denial did not reflect a neutral policy applied evenhandedly; on the facts Bryan observed, it was applied to him, the only Black customer he ever saw it applied to, and to no one else.

**M&T's Corporate Office and Its Written Responses Ignored the Central Facts**

47.    Following the incident, Bryan complained to M&T's corporate office by telephone. That complaint was protected activity under the ADA and the NYSHRL. M&T told him his

complaint would be reviewed. Bryan also submitted information concerning the incident to the New York State Division of Human Rights, which was likewise protected activity.

48.    By letter dated March 25, 2026, M&T acknowledged that Bryan had visited the Great Neck branch on February 19, 2026 and requested restroom access, and that the branch manager had advised him the facilities were for "employees only." M&T's letter invoked "non-public restroom facilities," unspecified security concerns, and New York General Business Law § 492, but never addressed that Bryan had Type II diabetes, that M&T's own employees knew of his condition, or that M&T had permitted his restroom use at that branch for approximately a decade without incident.

**Six Weeks After Bryan Complained, M&T Severed the Entire Banking Relationship**

49.    On or about April 4, 2026, roughly six weeks after Bryan complained of discrimination and submitted information to the Division of Human Rights, he returned to the Great Neck branch to make a deposit. A teller told him that all of his accounts had been closed. He had not closed his accounts, had not authorized their closure, and had not received meaningful prior notice that M&T intended to close them.

50.    When Bryan asked Connors for an explanation and asked where his money was, she told him, in substance, that she could not talk to him and that he needed to "handle this yourself." She provided no explanation, no written basis for the closures, no point of contact, and no access to his funds.

51.    A security guard then approached Bryan and told him to leave. When he attempted to record the encounter, the guard threatened to call the police. Bryan observed Connors go into her office and make a telephone call before he left the branch without an explanation or access to his funds. M&T's corporate office, when he called, likewise told him only that his accounts had been closed and that it was on him to resolve the issue.

52. Approximately one month later, M&T mailed Bryan checks representing the closed accounts' balances, totaling approximately $60,000. M&T paid no interest for the period he was denied access to those funds. M&T also sent him an account-closure letter that was undated and unsigned. The letter stated that his accounts had been closed "according to previous notification," notice that Bryan disputes ever receiving, and that outstanding checks and any card linked to the accounts would be rejected. The letter did not identify who made the closure decision or state a specific reason for it. At the time of the closures, Bryan's deposit accounts were active, and his lines of credit were not delinquent or in default.

53. Bryan attempted to address this matter with M&T at the Great Neck Branch, but could not be assisted by the tellers and Connors refused to engage with him.

54. M&T's closure of Bryan's accounts and limited access to credit lines, including lines of credit on information and belief, with limits of approximately $25,000, $20,000, and $10,000, had immediate consequences. His checks and credit-card payments were returned, his mortgage and SBA loan payments were affected, and his personal and business credit was damaged. At the same time, M&T continued to demand payment on the blocked credit lines without providing him clear information about them.

55. Bryan eventually located Chris Dell'Anno, a senior M&T employee at the Greenvale branch, who provided some assistance, but only after significant delay.

**On July 20, 2026, M&T Invoked Its Own Unlawful Account Closures to Strip Bryan of Favorable Credit Terms**

56. On Monday, July 20, 2026, a representative of M&T telephoned Bryan and informed him that the terms governing his business lines of credit would be modified.

57. M&T told Bryan that the modification was being made because he no longer maintained any deposit account with the Bank. The sole reason Bryan no longer maintained a

12

deposit account with M&T is that M&T unilaterally closed every deposit account he held, without his request, without his authorization, and without meaningful prior notice, as alleged above.

58.    Specifically, M&T informed Bryan that he would no longer be permitted to service his business lines of credit through interest-only payments, and that he would instead be required to make payments of both interest and principal.

59.    The July 20, 2026 modification unfavorably and materially altered the terms of Bryan's existing credit obligations. It increased his required periodic payments, accelerated his repayment obligations, and further reduced the cash available to operate his businesses at a time when those businesses were already impaired by the account closures, by Bryan's loss of access to his funds, and by the resulting damage to his personal and business credit.

60.    M&T's stated justification is circular and rests entirely on a condition that M&T itself created. M&T closed Bryan's deposit accounts unilaterally, without meaningful notice and without any signed, dated, or specific explanation, and then invoked the resulting absence of a deposit relationship as the basis for withdrawing favorable repayment terms on the credit obligations it left in place. Bryan did nothing to bring about the condition on which M&T now relies.

61.    M&T's July 20, 2026 modification of Bryan's existing credit constituted an adverse action. M&T did not provide Bryan with any written statement of the specific reasons for the modification. It did not identify the person or office responsible for the decision. It did not disclose Bryan's right to obtain a statement of the specific reasons for the action, the time period within which he could request those reasons, or the name and address of the person or office from which they could be obtained. It did not provide the required ECOA notice. And it did not

13

identify which particular credit obligations were affected or when the modified terms would take effect.

62.    At the time of the July 20, 2026 modification, Bryan's lines of credit were not delinquent or in default, and M&T identified no default, missed payment, deterioration in Bryan's financial condition, decline in collateral value, or other disqualifying condition as a basis for the change. Upon information and belief, the modification did not affect all or substantially all of a class of M&T's accounts, but was directed at Bryan individually.

63.    The July 20, 2026 modification occurred approximately five months after Bryan requested a disability-related modification and complained of discrimination, approximately four months after M&T's March 25, 2026 letter responding to that complaint, and while Bryan's grievance concerning the February 19, 2026 incident and the April 4, 2026 closures remained unresolved. It is the third in a continuing course of adverse treatment that began the moment Bryan disclosed his disability.

**M&T Retaliation Devastated Bryan's Business, Credit, and Personal Life**

64.    Bryan spent approximately three weeks attempting to open replacement business accounts elsewhere as a result of the account closures. That process was lengthened by the account-opening compliance requirements now imposed on new business accounts. During those three weeks, he could not conduct ordinary business operations.

65.    Bryan owns and/or operates two automobile wholesale businesses, Bryan Auto Wholesalers and Sandspoint Auto Sales. In the ordinary course of that business, he purchases vehicles at auction using credit, holds the vehicles in inventory while accruing interest on that credit, and then resells them to buyers. The interest rate available to him for this inventory financing is tied to his credit profile, such that a lower credit score results in a higher interest rate and a reduced profit margin on each vehicle sold. M&T's closure of his accounts and credit lines,

14

and the resulting damage to his personal and business credit, increased the cost of the credit he relies on to finance vehicle inventory for both businesses, directly reducing his profit margin on vehicles sold since the closures.

66.    M&T's July 20, 2026 elimination of Bryan's interest-only repayment terms compounded that harm by increasing the periodic debt service owed on his remaining lines of credit, further reducing the working capital available to acquire inventory and further compressing his margin on each vehicle sold.

67.    Bryan also owns and operates Westport Holdings, a real-estate business. Because he could not access the Westport Holdings business account M&T had closed, he was unable to complete a pending sale of real property for approximately $210,000, and lost that sale as a result. The failure to complete the sale of that real property caused Westport Holdings a net loss of approximately $30,000.

68.    Bryan Auto Wholesalers and Sandspoint Auto Sales each ordinarily generate approximately $2,500 in net profit per week. As a direct result of M&T's closure of their business accounts, each business was unable to operate normally for approximately three weeks, causing aggregate lost net profits of approximately $15,000.

69.    As a further and continuing result of M&T's July 20, 2026 modification, Bryan is now required to pay principal in addition to interest on his business lines of credit. That change increases his monthly payment obligations and will continue to divert funds from the operation of his businesses for so long as those obligations remain outstanding.

70.    Bryan's damaged personal and business credit has also impaired his efforts to rent or purchase a personal residence in New York City. Prospective landlords routinely run credit checks as part of a rental application and mortgage lenders price loans based on an applicant's credit profile. The resulting damage to his credit has impaired, and is reasonably expected to

15

continue impairing, his ability to obtain favorable rental and mortgage terms. He was also unable to move funds from linked stock-trading accounts to mitigate any of these losses.

71.    Bryan regularly conducts business in and around Great Neck and passes M&T's Great Neck branch in the course of his business dealings. Prior to the events described herein, Bryan banked at the Great Neck branch on a weekly basis for approximately a decade, reflecting a genuine and ongoing pattern of patronage rather than an isolated visit.

72.    Bryan would resume banking at the Great Neck branch, including using its restroom facilities as needed for his Type II diabetes, but for M&T's ongoing policy and practice of denying that accommodation. That policy remains in effect and continues to deter Bryan from returning. Absent injunctive relief, Bryan faces a real and immediate threat of encountering the same discriminatory conduct if he attempts to resume his banking relationship with M&T.

73.    The sequence of events supports the inference that Bryan's race was a but-for cause of Defendants' conduct. Separately and in the alternative, it supports the inference that his disability and his protected activity were causes of that conduct. Plaintiff pleads these theories in the alternative to the extent the governing causation standards differ. For approximately a decade, Bryan had unremarkable access to the restroom. That access was abruptly denied the moment he disclosed his disability. He then complained to M&T corporate and to the Division of Human Rights.

74.    Within approximately six weeks, M&T closed his accounts and limited access to credit lines, without meaningful notice or a specific explanation. M&T then used those same closures as the stated predicate for stripping Bryan of the favorable interest-only repayment terms he had enjoyed on his business lines of credit, imposing a further unfavorable change in the terms of his existing credit without any statement of specific reasons and without identifying any default or other legitimate basis. At no point in this sequence has M&T offered a

contemporaneous, specific, non-retaliatory explanation for any of the adverse actions it has taken against Bryan.

75.     As a direct and proximate result of Defendants' conduct, Bryan suffered humiliation, emotional distress, loss of access to funds and credit, the loss of favorable repayment terms and a resulting increase in his periodic debt-service obligations, damage to his personal and business credit, business interruption, lost revenue and business opportunities, and consequential financial losses.

## CAUSES OF ACTION

### COUNT I – DISCRIMINATION AND FAILURE TO MAKE REASONABLE MODIFICATIONS - ADA *Title III, 42 U.S.C. § 12181 et seq.*
### Against Defendant M&T Bank

76.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

77.     At all relevant times, Bryan has Type II diabetes, a physical impairment that substantially limits one or more major life activities, including endocrine function, and is an individual with a disability within the meaning of 42 U.S.C. § 12102 and 28 C.F.R. § 36.105. Under the regulations implementing Title III of the ADA, diabetes is an impairment that will, in virtually all cases, be found to substantially limit endocrine function. 28 C.F.R. § 36.105(d)(2)(iii)(H); see also *Gosby v. Apache Industrial Services, Inc.*, 30 F.4th 523, 524 (5th Cir. 2022)(recognizing diabetes as a condition covered by the ADA under the parallel employment regulation, 29 C.F.R. § 1630.2(j)(3)(iii)).

78.     Whether Bryan's Type II diabetes substantially limits a major life activity must be assessed without regard to the ameliorative effects of mitigating measures, including medication, diet, or other treatment he may use to manage the condition. 42 U.S.C. § 12102(4)(E)(i).

17

79.     M&T's Great Neck branch is a place of public accommodation within the meaning of 42 U.S.C. § 12181(7)(F), which expressly includes a bank.

80.     Title III prohibits a public accommodation from failing to make reasonable modifications to its policies, practices, or procedures when necessary to afford individuals with disabilities full and equal enjoyment of its goods and services, unless the modification would fundamentally alter their nature. 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682–83 (2001).

81.     Bryan's request was reasonable on its face. For approximately a decade, M&T had granted him exactly the access he requested on February 19, 2026, at the same branch, without any known disruption or security concern. Indeed, that access was not an individualized accommodation extended to him alone. It was an established practice, permitted by prior branch management including former branch manager Axel Izquierda, that Bryan personally observed being extended to other customers as well.

82.     M&T's invocation of New York General Business Law § 492 and a purported "non-public facilities" designation does not excuse its refusal. Even assuming the restroom is not subject to Section 492's separate public-restroom access requirements, Title III's reasonable-modification obligation is independent of that statute.

83.     Courts have rejected a defendant's speculative fundamental-alteration defense where the defendant's own history contradicts it, as where a business tolerated years of the very conduct it later claimed would be disruptive, without incident. *See Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845–46 (9th Cir. 2004) (rejecting a concert hall's fundamental-alteration defense where its own history of tolerating a service animal's occasional noise, without patron complaint, contradicted its speculation about future disruption). M&T's own decade-long practice of permitting customer restroom use, for Bryan and other customers

18

alike, without incident, likewise demonstrates that granting the requested access would not fundamentally alter the nature of M&T's services.

84.    M&T denied Bryan's request without conducting any individualized assessment, without identifying any safety or security risk specific to him, and without explaining why access it had granted for years had suddenly become unreasonable.

85.    As alleged above, Bryan's proximity to and history of regular patronage at the Great Neck branch, combined with M&T's ongoing policy of denying his accommodation, establish a real and immediate threat of future injury sufficient to confer standing for injunctive relief. See *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013) (plaintiff need not engage in the "futile gesture" of returning to a noncompliant facility where the barrier remains in place).

86.    M&T violated Title III of the ADA. Accordingly, Plaintiff is entitled to declaratory and injunctive relief, together with attorneys' fees and costs, under 42 U.S.C. §§ 12188(a), 12205.

### COUNT II – RETALIATION AND INTERFERENCE
### ADA *42 U.S.C. § 12203*
### Against Defendant M&T Bank

87.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

88.    To establish a claim under the ADA's anti-retaliation provision, Plaintiff must show that: (i) he engaged in activity protected by the ADA; (ii) M&T knew of that protected activity; (iii) M&T took an adverse action against him; and (iv) a causal connection exists between the protected activity and the adverse action. *Natofsky v. City of New York*, 921 F.3d 337, 352–53 (2d Cir. 2019). That causal connection may be shown indirectly, by evidence that

the protected activity was followed closely by adverse treatment, or directly, through evidence of retaliatory animus. *Natofsky*, 921 F.3d at 353.

89.    Bryan engaged in activity protected by 42 U.S.C. § 12203(a) when he requested a disability-related modification on February 19, 2026, when he opposed M&T's refusal to provide it, when he complained to M&T's corporate office, and when he submitted information concerning the incident to the New York State Division of Human Rights.

90.    M&T knew of this protected activity. Its own March 25, 2026 letter acknowledged and responded to Bryan's complaint, and its corporate office separately confirmed by telephone that his complaint had been received and would be reviewed.

91.    Within approximately six weeks of that complaint, M&T closed Bryan's personal and business accounts and limited access to his lines of credit without meaningful notice, refused to explain the closures, denied him timely access to his funds, and had security threaten to involve the police when he sought an explanation. Conduct is actionable under the ADA's anti-retaliation provision where it is materially adverse. A materially adverse action is one harmful enough that it could well dissuade a reasonable person from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68 (2006). M&T's conduct meets that standard. Closing every account a longstanding customer holds with his bank and modifying his credit lines, without notice or explanation, and denying him access to his own funds for weeks, is exactly the kind of consequence that would deter a reasonable person from complaining of discrimination in the first place.

92.    M&T's retaliation did not end with the closures. On July 20, 2026, M&T eliminated the interest-only repayment terms on Bryan's business lines of credit and required him to begin paying principal in addition to interest, increasing his periodic payment obligations on credit he had held and serviced for years. The only ground M&T offered was that Bryan no longer

20

maintained deposit accounts with the Bank. M&T had closed those accounts itself. Stripping a longstanding customer of favorable repayment terms on that basis is conduct that well might dissuade a reasonable person from making or supporting a charge of discrimination. *Burlington N.*, 548 U.S. at 68.

93.     The July 20, 2026 modification is actionable both independently and as part of a continuing course of retaliation. Alleged acts of retaliation must be considered both separately and in the aggregate, because even lesser acts of retaliation may be sufficiently substantial in gross to be actionable. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)). Considered together, M&T's denial of Bryan's accommodation request, its closure of every account and credit line he held, its refusal to explain those closures, its threat to summon police when he sought an explanation, and its subsequent withdrawal of his favorable credit terms constitute a sustained campaign of adverse treatment following protected activity.

94.     Approximately six weeks passed between Bryan's protected activity and the closure of his accounts and credit lines, and M&T's adverse treatment then continued through July 20, 2026. That temporal proximity, the continuing course of adverse treatment, and M&T's failure to offer any contemporaneous, specific, non-retaliatory explanation for the closures, support an inference of a causal connection. See *Treglia v. Town of Manlius*, 313 F.3d 713, 719–20 (2d Cir. 2002).

95.     The only explanation M&T has ever offered for any of its adverse actions is that Bryan no longer maintains a deposit account with the Bank, a condition M&T created through the very conduct Bryan challenges. A justification that exists only because of the defendant's own challenged act is no legitimate explanation at all. Its assertion here reinforces the inference of retaliatory causation rather than rebutting it.

21

96.    M&T's conduct separately violated the ADA's interference provision, 42 U.S.C. § 12203(b), which makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of any right protected by the ADA. A plaintiff states an interference claim by showing that: (1) he engaged in ADA-protected activity; (2) he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA-protected rights; (3) the defendant coerced, threatened, intimidated, or interfered with him on account of that activity; and (4) the defendant was motivated by an intent to discriminate. *See Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017).

97.    Bryan engaged in activity protected by the ADA when he requested a disability-related modification and complained of M&T's refusal to provide it. When he returned to the branch and pressed M&T for an explanation of the account closures that followed his complaint, M&T's security guard threatened to call the police rather than allow him to document the encounter. That threat came in the immediate aftermath of Bryan's exercise of ADA-protected rights, and was directly connected to it.

98.    M&T further interfered with Bryan's exercise and enjoyment of ADA-protected rights on July 20, 2026 by imposing increased financial burdens on his existing credit obligations, thereby attaching a continuing economic penalty to his having sought and pressed a disability-related accommodation.

99.    M&T's retaliatory and interfering conduct is ongoing. M&T continues to administer Bryan's outstanding credit obligations on the modified terms imposed on July 20, 2026, and has continued to take adverse action against him as recently as that date. Declaratory and injunctive relief is therefore necessary to prevent further retaliation and interference, including relief restoring the repayment terms M&T withdrew.

100.   M&T violated 42 U.S.C. § 12203(a) and (b). Accordingly, Plaintiff is entitled to declaratory and injunctive relief, together with attorneys' fees and costs, under 42 U.S.C. §§ 12203(c), 12188(a), 12205.

**COUNT III – DISABILITY DISCRIMINATION AND RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, *29 U.S.C. § 794***
**Against Defendant M&T Bank**

101.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

102.   Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of that disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

103.   Bryan is an individual with a disability within the meaning of Section 504. Section 504 incorporates the definition of disability set forth in the Americans with Disabilities Act. 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102. For the reasons alleged in Count I, Bryan's Type II diabetes is a physical impairment that substantially limits one or more major life activities, including the operation of his endocrine system.

104.   Bryan was otherwise qualified to participate in and receive the benefits of M&T's banking, lending, credit, and loan-servicing services. He was a longstanding M&T customer who maintained personal and business deposit accounts, credit facilities, and an SBA-backed loan with the Bank and satisfied the ordinary requirements applicable to those services.

105.   Because of his diabetes, Bryan periodically required immediate access to a restroom while conducting banking business at M&T's Great Neck branch. Continued access to the branch restroom was a reasonable, minor, and readily available accommodation that enabled

Bryan to remain at the branch and obtain meaningful access to M&T's services. *See Alexander v. Choate*, 469 U.S. 287, 300–01 (1985) (Section 504 requires that an otherwise qualified individual with a disability be afforded meaningful access to the benefits offered, which may require reasonable accommodation).

106.    The requested accommodation imposed no material cost, operational burden, or safety risk and required no fundamental alteration of M&T's banking services. Indeed, M&T had permitted Bryan to use the same branch restroom for approximately a decade without incident, disruption, or difficulty.

107.    Upon information and belief, M&T is a recipient of federal financial assistance within the meaning of Section 504. M&T voluntarily participates in lending and loan-guaranty programs administered by the United States Small Business Administration and operates as an SBA Preferred Lender.

108.    Upon information and belief, during the relevant period, M&T actually received federal funds through those programs, including direct payments, reimbursements, guaranty-purchase proceeds, or other federal funds paid to M&T in connection with its SBA lending and loan-servicing operations.

109.    The precise nature and extent of the federal funds received by M&T are peculiarly within M&T's possession and control and will be established through discovery. M&T did not merely derive an incidental economic benefit from federal assistance provided to its borrowers. Rather, M&T voluntarily participated in the SBA programs and, upon information and belief, directly accepted federal funds in connection with its lending and loan-servicing activities.

110.    Bryan's own banking relationship with M&T included an SBA-backed loan, together with related deposit accounts, credit facilities, repayment obligations, and loan-servicing services maintained or administered by M&T. A lender that voluntarily

24

participates in an SBA guarantee program and directly receives federal reimbursement through that program may constitute a recipient of federal financial assistance under Section 504. See *Moore v. Sun Bank of North Florida, N.A.*, 923 F.2d 1423, 1431–33 (11th Cir. 1991), reinstated, 963 F.2d 1448 (11th Cir. 1992); *DiFillippo v. Special Metals Corp.*, 299 F.R.D. 348, 356 (N.D.N.Y. 2014) (recognizing *Moore*'s treatment of federal guaranty arrangements and declining to dismiss a Rehabilitation Act claim where the existence and nature of the defendant's federal financial assistance required further factual development).

111.    Under 29 U.S.C. § 794(b), M&T's SBA lending and loan-servicing operations constitute the relevant covered program or activity to the extent federal financial assistance was extended to those operations. To the extent such assistance was extended to the Great Neck branch or to M&T as a whole, the branch or all of M&T's operations, respectively, fall within the statute's coverage. 29 U.S.C. § 794(b)(3)(A)(i), (B).

112.    M&T's federally assisted lending and loan-servicing operations were directly connected to Bryan's banking relationship. Bryan maintained his SBA-backed loan, related deposit accounts, credit facilities, and repayment obligations through M&T, and he visited the Great Neck branch to conduct business concerning that relationship. Access to the branch restroom was necessary for Bryan to remain at the branch and complete his banking and loan-related transactions.

113.    Plaintiff pleads this Section 504 claim in the alternative to his other statutory claims. For purposes of the disability-discrimination component of this count, M&T denied Bryan the requested accommodation solely by reason of his disability and his disability-related need for immediate restroom access.

114.    For approximately a decade, M&T permitted Bryan to use the restroom at its Great Neck branch. When Bryan requested the same access and expressly explained that his

25

immediate need arose from his Type II diabetes, M&T refused the accommodation, persisted in that refusal after learning of the disability-related reason for his request, and offered no effective alternative.

115.   M&T did not identify any safety concern, operational burden, undue hardship, or other legitimate reason why the accommodation could no longer be provided. Nor did M&T conduct a meaningful individualized assessment of Bryan's disability-related need, consider the accommodation it had successfully provided for years, or engage with Bryan concerning a reasonable alternative that would permit him to access its services safely and on equal terms.

116.   Instead, M&T departed from its longstanding practice at the precise point Bryan expressly disclosed his disability and requested an accommodation. By refusing the requested accommodation under those circumstances, M&T denied Bryan meaningful and equal access to its banking, lending, credit, and loan-servicing services solely by reason of his disability, in violation of Section 504.

117.   Bryan thereafter engaged in activity protected by Section 504 when he requested a reasonable disability-related accommodation, explained that his need for immediate restroom access arose from his diabetes, objected to M&T's refusal, and complained that M&T's treatment was discriminatory. *See Weixel v. Board of Education of City of New York*, 287 F.3d 138, 148–50 (2d Cir. 2002) (seeking a reasonable accommodation constitutes protected activity under Section 504).

118.   M&T, through Connors and the other employees and officials responsible for Bryan's banking relationship, knew that Bryan had requested disability-related accommodation and had objected to M&T's refusal to provide it.

119.   Within approximately six weeks of Bryan's protected activity, M&T closed his personal and business deposit accounts and credit lines, refused to provide a meaningful

explanation for those actions, delayed or denied his timely access to funds, and subsequently withdrew or modified favorable repayment terms that Bryan had maintained while continuing to perform his obligations.

120. M&T's closure of Bryan's accounts and credit facilities, interference with his access to funds, and withdrawal or modification of his repayment terms constituted materially adverse actions that would deter a reasonable person from requesting a disability-related accommodation or opposing disability discrimination.

121. The close temporal proximity between Bryan's protected activity and M&T's actions, the absence of any identified default, missed payment, deterioration in Bryan's financial condition, or other legitimate intervening event, M&T's departure from its longstanding treatment of Bryan, and the escalating sequence of adverse actions support a reasonable inference that M&T acted because Bryan requested a disability-related accommodation and opposed M&T's discriminatory treatment.

122. M&T acted intentionally or, at minimum, with deliberate indifference to Bryan's federally protected rights. Connors, as manager of the Great Neck branch, possessed authority to address Bryan's request, grant access to the branch restroom, and institute corrective measures concerning the branch's treatment of Bryan.

123. Connors knew that Bryan had Type II diabetes, knew that his need for immediate restroom access was connected to that condition, and knew that M&T had provided the requested access for approximately a decade. Connors nevertheless deliberately refused the accommodation without conducting an individualized assessment or providing an effective alternative.

124. Upon information and belief, the M&T officials who authorized, approved, or implemented the subsequent closure of Bryan's deposit accounts and credit facilities,

restrictions on his access to funds, and withdrawal or modification of his repayment terms likewise knew of Bryan's accommodation request and discrimination complaint, possessed authority to prevent or correct the resulting violations, and deliberately failed to do so. *See Loeffler v. Staten Island University Hospital,* 582 F.3d 268, 275–76 (2d Cir. 2009) (intentional discrimination may be established where an official with authority to address the discrimination and institute corrective measures has actual knowledge of the discrimination and deliberately fails to respond adequately).

125. As a direct and proximate result of M&T's disability discrimination and retaliation, Bryan suffered provable economic injuries, including loss of access to his funds and credit, out-of-pocket expenses incurred in obtaining replacement banking and credit services, increased financing and repayment costs, damage to his personal and business credit, business interruption, lost profits, and lost business opportunities. Bryan does not seek recovery duplicative of the same injuries redressed under his other causes of action.

126. By the conduct alleged above, M&T violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Because Section 504 incorporates the remedies, procedures, and rights available under Title VI of the Civil Rights Act of 1964, Bryan is entitled to compensatory damages for his provable economic injuries, declaratory and injunctive relief, and reasonable attorneys' fees and costs. 29 U.S.C. § 794a(a)(2), (b).

**COUNT IV – RACE DISCRIMINATION AND RETALIATION IN CONTRACTUAL RELATIONSHIPS - *42 U.S.C. § 1981***
**Against All Defendants**

127. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

128. Bryan is Black. His deposit accounts and lines of credit with M&T were contractual relationships protected under 42 U.S.C. § 1981, which guarantees the right to make,

28

perform, modify, and enjoy the benefits of contracts free of racial discrimination, and reaches the ordinary commercial relationship between a bank and its customer no less than any other contract. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). To state a claim, Plaintiff need only plausibly allege that, absent racial animus, M&T would not have terminated Bryan's accounts and credit lines, or modified the terms of his existing credit, when and how it did. *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020).

129.   Section 1981 expressly reaches conduct occurring during the life of an existing contractual relationship, not merely its formation or termination. The term "make and enforce contracts" is statutorily defined to include "the making, performance, *modification*, and termination of contracts, and the enjoyment of all benefits, privileges, *terms, and conditions* of the contractual relationship." 42 U.S.C. § 1981(b). Congress added that definition in the Civil Rights Act of 1991 for the express purpose of overruling *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), and confirming that § 1981 protects against racially discriminatory conduct in the administration and modification of an ongoing contract.

130.   That standard is met here. M&T abruptly reversed a decade-long course of dealing, deprived Bryan of the benefit of his accounts and credit lines shortly after he complained of discriminatory treatment, and did so without meaningful notice, without any specific explanation, and through an unsigned, undated closure letter that never identified who made the decision or why. M&T then compounded that conduct on July 20, 2026 by unilaterally altering the terms and conditions of the credit obligations it had left in place, again without any specific or legitimate explanation.

131.   As alleged above, M&T extended to non-Black customers the very restroom access it denied to Bryan, the only customer he ever observed being refused. That differential

treatment, the abrupt reversal of a decade-long course of dealing, the timing of the closures and modification relative to Bryan's complaints, and the absence of any legitimate, contemporaneous explanation for conduct that departed so sharply from years of unremarkable dealing together support the inference that race was a but-for cause of M&T's conduct.

132.   The July 20, 2026 modification is independently actionable under § 1981(b). By withdrawing the interest-only repayment terms on which Bryan had serviced his lines of credit for years and substituting a materially more burdensome payment obligation, M&T altered the "terms and conditions of the contractual relationship" and deprived Bryan of benefits and privileges he had previously enjoyed under it. 42 U.S.C. § 1981(b).

133.   The justification M&T gave for the July 20, 2026 modification supports rather than defeats the inference of but-for causation. M&T's stated reason was the absence of a deposit relationship, a circumstance created entirely by M&T's own unexplained closure of Bryan's accounts. A reason that exists only because of the defendant's own challenged conduct is no reason at all. Its invocation permits the inference that the true reason for both actions was one M&T was unwilling to state.

134.   M&T and Connors are further liable for retaliating against Bryan, in violation of Section 1981, for complaining about race discrimination affecting his contractual relationships. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451–52 (2008). M&T's retaliation includes both its April 4, 2026 termination of Bryan's accounts and credit lines and its July 20, 2026 modification of the terms of his remaining credit obligations.

135.   Connors is individually liable alongside M&T because Section 1981 liability extends to any individual who is personally, causally involved in the challenged discrimination. She meets that standard directly. She personally denied Bryan's restroom request and during the retaliatory encounter of April 4, 2026, she personally refused him any explanation, assistance,

30

or access to his funds. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).

136.   M&T and Connors violated 42 U.S.C. § 1981. Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, costs, and interest against M&T and Connors, jointly and severally.

### COUNT V – RACE DISCRIMINATION IN CREDIT TRANSACTIONS
*Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq.*
### Against Defendant M&T Bank

137.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

138.   Defendant M&T Bank is a "creditor" within the meaning of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691a(e), because it regularly extends, renews, and continues credit, including the lines of credit maintained by Plaintiff.

139.   Plaintiff was an "applicant" within the meaning of the ECOA and Regulation B because he had requested and received extensions of credit from M&T and remained contractually liable upon the credit obligations maintained with the Bank. See 15 U.S.C. § 1691a(b); 12 C.F.R. § 1002.2(e).

140.   The ECOA prohibits a creditor from discriminating against an applicant, with respect to *any aspect* of a credit transaction, on the basis of race. 15 U.S.C. § 1691(a)(1). Regulation B defines "credit transaction" expansively to mean "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit," expressly including "terms of credit" and the "revocation, alteration, or termination of credit." 12 C.F.R. § 1002.2(m). The statute therefore reaches not only the initial extension of credit, but also the administration, continuation, modification, and termination of an existing credit relationship. See 12 C.F.R. §§ 1002.2(m), 1002.6(b)(2).

31

141.    Bryan is Black and is therefore a member of a class protected under the ECOA.

142.    Before the events described herein, Bryan had maintained several lines of credit with M&T for years, including lines of credit with limits of approximately $25,000, $20,000, and $10,000, each of which M&T permitted him to service on interest-only terms. M&T had continued those credit relationships without any identified material default, disqualifying change in financial condition, or other stated basis for termination or modification.

143.    On or about April 4, 2026, M&T terminated, revoked, suspended, or otherwise rendered unavailable Bryan's existing lines of credit. The revocation or termination of existing credit constituted an adverse action under the ECOA. See 15 U.S.C. § 1691(d)(6); 12 C.F.R. § 1002.2(c).

144.    On July 20, 2026, M&T took a second adverse action against Bryan's existing credit when it withdrew his interest-only repayment terms and required payment of principal in addition to interest. Regulation B defines "adverse action" to include "a termination of an account *or an unfavorable change in the terms of an account* that does not affect all or substantially all of a class of the creditor's accounts." 12 C.F.R. § 1002.2(c)(1)(ii). The July 20, 2026 modification was an unfavorable change in the terms of Bryan's existing credit accounts and, upon information and belief, was directed at Bryan individually rather than at all or substantially all of a class of M&T's accounts.

145.    Neither exclusion from the definition of adverse action applies. The July 20, 2026 modification was not "action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account," 12 C.F.R. § 1002.2(c)(2)(ii), because Bryan's lines of credit were neither inactive, in default, nor delinquent, and M&T identified no such condition. Nor was it a change affecting all or substantially all of a class of M&T's accounts.

32

146.    M&T took the April 4, 2026 adverse action approximately six weeks after Bryan complained that he had been subjected to discriminatory treatment at the Great Neck branch, and took the July 20, 2026 adverse action while that grievance remained unresolved. M&T terminated and then modified the longstanding credit relationships without providing Bryan any contemporaneous, specific, or legitimate explanation for doing so.

147.    M&T's conduct departed abruptly from the parties' longstanding credit relationship. The Bank terminated all of Bryan's lines of credit at or near the same time, refused to identify the person responsible for the decision, and provided only an undated and unsigned account-closure letter that did not state any particular reason for terminating his credit. When M&T later altered the repayment terms of the same credit obligations, it again identified no decisionmaker and no creditworthiness-based reason.

148.    M&T has articulated only one reason for taking adverse action against Bryan's credit: that he no longer maintains a deposit account with the Bank. That is not a legitimate, non-discriminatory reason. It bears no relation to Bryan's creditworthiness, it was never identified at the time of the April 4, 2026 terminations, and it describes a circumstance M&T alone created by closing his deposit accounts without authorization or explanation. A creditor cannot manufacture the predicate for an adverse credit action and then rely on that predicate as its justification.

149.    Bryan is visibly Black and was personally known to Connors and other Great Neck branch staff, who interacted with him in person on February 19 and April 4, 2026. Connors therefore knew Bryan was Black. Upon information and belief, the person or persons at M&T who participated in or approved the closure and modification of Bryan's accounts and credit likewise knew or perceived that Bryan was Black and knew that he had complained of discriminatory treatment.

150. The timing of each adverse action, M&T's abrupt departure from its prior course of dealing, its termination of multiple credit relationships simultaneously, its subsequent imposition of more burdensome terms on the credit that remained, its refusal to disclose a specific reason for its decision, and its subsequent treatment of Bryan support a plausible inference that Bryan's race was a motivating factor in, and a but-for cause of, M&T's decisions to terminate, revoke, or modify his credit. That M&T took adverse action against Bryan's credit twice, months apart, and on each occasion without a stated creditworthiness-based reason, forecloses any inference that its conduct was an isolated administrative event.

151. As a direct and proximate result of M&T's discriminatory conduct, Bryan lost access to previously available credit, lost favorable repayment terms and incurred increased periodic debt-service obligations, suffered damage to his personal and business credit, incurred increased financing costs, experienced disruption to his businesses, lost business opportunities and profits, and sustained other consequential financial harm.

152. M&T violated 15 U.S.C. § 1691(a)(1). Accordingly, Plaintiff is entitled to actual damages, punitive damages, equitable and declaratory relief, reasonable attorneys' fees and costs, and interest pursuant to 15 U.S.C. § 1691e.

**COUNT VI – FAILURE TO PROVIDE A COMPLIANT NOTICE OF ADVERSE ACTION - Equal Credit Opportunity Act and Regulation B *15 U.S.C. § 1691(d); 12 C.F.R. § 1002.9* Against Defendant M&T Bank**

153. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

154. Defendant M&T Bank is a "creditor," and Bryan was an "applicant," within the meaning of the ECOA and Regulation B. See 15 U.S.C. § 1691a(b), (e); 12 C.F.R. § 1002.2(e), (l).

155. M&T's termination, revocation, suspension, or material restriction of Bryan's existing lines of credit constituted an "adverse action" because it revoked credit previously granted to him and/or changed the terms of his existing credit arrangements. See 15 U.S.C. § 1691(d)(6); 12 C.F.R. § 1002.2(c).

156. M&T's July 20, 2026 withdrawal of Bryan's interest-only repayment terms was a separate and independent adverse action, because it was an unfavorable change in the terms of an existing account that did not affect all or substantially all of a class of M&T's accounts. 12 C.F.R. § 1002.2(c)(1)(ii). It therefore triggered a separate and independent notice obligation.

157. The ECOA requires a creditor to notify an applicant of adverse action and entitles the applicant to a statement of the reasons for that action. 15 U.S.C. § 1691(d)(2). The disclosed reasons must be specific and must identify the principal reasons actually relied upon by the creditor. See 15 U.S.C. § 1691(d)(3); 12 C.F.R. § 1002.9(a)–(b). Regulation B provides that a statement of reasons "must be specific and indicate the principal reason(s) for the adverse action," and that statements resting on "the creditor's internal standards or policies" are insufficient. 12 C.F.R. § 1002.9(b)(2). The reasons given must relate to and accurately describe the factors actually considered by the creditor. 12 C.F.R. pt. 1002, app. C, cmt. 3.

158. The specificity requirement is substantive, not formal. A statement of reasons that leaves the applicant to speculate about the creditor's actual standards is "misleading, or at best excessively vague," and does not satisfy the informative purposes of the ECOA. *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 146–48 (5th Cir. 1983). The requirement exists so that, in cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake. *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 977 (7th Cir. 2004) (citing *Fischl*, 708 F.2d at 146).

159. Regulation B required M&T, within the applicable statutory period, either to provide Bryan with a written statement containing the specific reasons for the adverse action or to provide written notice informing him of his right to obtain those reasons and identifying the manner and time in which he could do so. See 12 C.F.R. § 1002.9(a)(1), (2), (b)(1)–(2). Where adverse action is taken on an existing account, that notice was due within thirty days of the action taken. 12 C.F.R. § 1002.9(a)(1)(iii).

160. To the extent any of the affected lines of credit constituted business credit extended to a business having gross revenues of $1,000,000 or less in its preceding fiscal year, M&T was required to comply with 12 C.F.R. § 1002.9(a)(1) and (2), subject only to the limited accommodations set out in 12 C.F.R. § 1002.9(a)(3)(i). To the extent any affected line constituted business credit extended to a business having gross revenues in excess of $1,000,000, M&T was required to notify Bryan of the action taken within a reasonable time and to provide a written statement of the specific reasons for the adverse action, together with the ECOA notice, upon written request made within sixty days. 12 C.F.R. § 1002.9(a)(3)(ii). M&T satisfied neither standard.

161. M&T did not provide Bryan with a timely or compliant adverse-action notice concerning the termination, revocation, suspension, or restriction of his lines of credit.

162. The only written closure communication Bryan received was undated and unsigned. It stated generally that his "accounts" had been closed "according to previous notification," although Bryan disputes ever receiving any prior notification.

163. The closure communication did not clearly identify whether it applied to Bryan's deposit accounts, his lines of credit, or both. It did not separately identify the action taken with respect to each line of credit, did not state when the credit action became effective, and did not identify the particular credit obligations affected.

36

164. The closure communication did not provide any specific principal reason for terminating or revoking Bryan's lines of credit. It did not state that Bryan was delinquent, in default, no longer creditworthy, in violation of any account term, or subject to any other identified disqualifying condition.

165. The communication also failed to provide a meaningful disclosure of Bryan's right to request the specific reasons for the adverse action, the time period within which he could make such a request, the name and address of the person or office from which the reasons could be obtained, and the required ECOA notice.

166. M&T separately failed to provide any compliant notice of the July 20, 2026 adverse action. M&T communicated that action by telephone only. It provided no writing of any kind. It gave no statement of the specific principal reasons for the change beyond a reference to the absence of a deposit relationship. It did not identify the person or office that made the decision, did not disclose Bryan's right to obtain a statement of specific reasons or the sixty-day period within which to request them, did not furnish the ECOA notice required by 12 C.F.R. § 1002.9(b)(1), did not identify which particular credit obligations were affected, and did not state the effective date of the modified terms.

167. M&T's reference to the absence of a deposit relationship does not satisfy § 1002.9(b)(2) in any event. It is a statement of the Bank's internal policy rather than of any factor bearing on Bryan's creditworthiness, and Regulation B expressly provides that reasons resting on a creditor's internal standards or policies are insufficient. 12 C.F.R. § 1002.9(b)(2). It also fails to relate to or accurately describe any factor actually bearing on the decision, 12 C.F.R. pt. 1002, app. C, cmt. 3, and it describes only a condition M&T itself created.

168. When Bryan contacted M&T and personally visited the Great Neck branch seeking an explanation, M&T and its employees refused to provide him with the specific reasons for

37

terminating or revoking his credit. M&T likewise provided no specific reasons for the July 20, 2026 modification when it was communicated to him.

169.   M&T's failure to provide a compliant notice is independently actionable regardless of whether Bryan ultimately proves that the adverse action was motivated by race. The statutory notice requirement exists to provide transparency concerning credit decisions and to permit an applicant to determine whether an adverse action was unlawfully discriminatory.

170.   As a direct and proximate result of M&T's violation, Bryan was prevented from timely understanding, challenging, correcting, or mitigating the termination and subsequent modification of his credit. He remained unable to determine whether M&T had acted upon inaccurate information, an alleged default, discriminatory considerations, or another purported basis and was unable to take steps that might have preserved his existing repayment terms or arranged replacement financing before the increased payment obligations took effect.

171.   M&T violated 15 U.S.C. § 1691(d) and 12 C.F.R. § 1002.9 on two separate occasions. Accordingly, Plaintiff is entitled to actual damages, statutory punitive damages to the extent permitted by 15 U.S.C. § 1691e(b), equitable and declaratory relief, reasonable attorneys' fees and costs, and interest.

### COUNT VII – PUBLIC ACCOMMODATION DISCRIMINATION BASED ON DISABILITY - *NYSHRL §§ 296(2), 296(6)* Against All Defendants

172.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

173.   Bryan is disabled and is a member of classes protected under the NYSHRL. M&T's Great Neck branch is a place of public accommodation under N.Y. Exec. Law § 292(9), and Section 296(2) prohibits a place of public accommodation from denying a person its accommodations, advantages, facilities, or privileges because of race or disability, including

through a failure to make reasonable modifications to policies necessary to afford access to persons with disabilities. Bryan's Type II diabetes is a "disability" within the meaning of N.Y. Exec. Law § 292(21). The NYSHRL defines disability more broadly than the ADA and does not require that an impairment substantially limit a major life activity.

174.    The New York State Human Rights Law must be construed liberally to accomplish its remedial purposes, and independently of how comparably worded federal statutes have been construed. As amended in 2019, Section 300 directs that the provisions of Article 15 "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300. That mandate applies to Article 15 as a whole, including Section 296(2), and is not confined to the employment provisions of Section 296(1). See Golston-Green v. City of New York, 184 A.D.3d 24, 44 (2d Dep't 2020). Even before the 2019 amendment, the Human Rights Law was a remedial statute to be construed broadly to accomplish its purpose of eradicating discrimination and making victims whole. See Koerner v. State of New York, 62 N.Y.2d 442, 448–49 (1984); Matter of Aurecchione v. New York State Div. of Human Rights, 98 N.Y.2d 21, 25–26 (2002).

175.    Applying that mandate, courts analyze NYSHRL discrimination claims under the same differential-treatment standard that governs claims under the New York City Human Rights Law. A plaintiff need only show differential treatment, that he was treated less well, because of a discriminatory intent. See Wright v. White Plains Hosp. Med. Ctr., 237 A.D.3d 1143, 1145–46 (2d Dep't 2025); Mumin v. City of New York, 760 F. Supp. 3d 28, 55 (S.D.N.Y. 2024). Although articulated in the employment context, that standard follows from the liberal-construction mandate of Section 300, which by its terms governs the entire article, and

39

applies with equal force to a claim of discrimination in a place of public accommodation under Section 296(2).

176. Bryan was treated less well than the very customers whom M&T had permitted to use the same restroom, including himself for approximately a decade. For the reasons set forth in Count I, M&T denied him equal access to its restroom facilities because of his disability. M&T also abandoned a reasonable modification it had granted him for years, immediately after he disclosed his Type II diabetes.

177. Connors is individually liable alongside M&T. Section 296(6) separately makes it unlawful for any person to aid, abet, incite, compel, or coerce an act forbidden by the NYSHRL, and imposes liability on any individual who actually participates in the conduct giving rise to a discrimination claim, whether or not that individual is otherwise an "employer" or covered entity. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187 (2017) (Section 296(6) "extends liability to persons and entities beyond . . . employers, and this provision should be construed broadly"); *Feingold v. New York*, 366 F.3d 138, 157–58 (2d Cir. 2004) (an individual who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under Section 296(6) regardless of employer status). Connors meets that standard directly. She personally denied Bryan's restroom request, conducted no individualized assessment, offered no alternative, and became hostile once he explained the medical reason for his request.

178. M&T violated N.Y. Exec. Law § 296(2), and Connors violated N.Y. Exec. Law § 296(6). Accordingly, Plaintiff is entitled to compensatory damages, including damages for emotional distress, reasonable attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10), and interest, reasonable attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10), and interest, against M&T and Connors, jointly and severally.

**COUNT VIII – RETALIATION - NYSHRL *§§ 296(7), 296(6)***
**Against All Defendants**

179. Plaintiff realleges and incorporates by reference all preceding paragraphs.

180. Bryan engaged in activity protected under the NYSHRL when he requested a disability-related accommodation, opposed M&T's refusal to provide it, complained to M&T corporate, and submitted a preliminary intake questionnaire with the New York State Division of Human Rights concerning the discriminatory incident. M&T knew of that activity: its own March 25, 2026 letter acknowledged and responded to his complaint. Within approximately six weeks, M&T took the adverse action of closing his accounts and credit lines, without meaningful notice or explanation.

181. M&T took a further adverse action on July 20, 2026, when it withdrew the interest-only repayment terms on Bryan's business lines of credit and required him to pay principal in addition to interest, imposing a continuing financial penalty on credit he had held for years. The NYSHRL is to be construed liberally to accomplish its remedial purposes, independently of how analogous federal provisions have been construed. N.Y. Exec. Law § 300.

182. Under that standard, conduct that would deter a reasonable person from engaging in protected activity is actionable. M&T denied Bryan an accommodation, closed every account and credit line he held, refused him any explanation, threatened to summon police when he pressed for one, and then increased his payment obligations. That course of conduct plainly meets the standard.

183. A retaliation claim under the NYSHRL requires evidence of protected activity, the defendant's knowledge of it, an adverse action, and a causal connection between the two. That connection may rest on temporal proximity alone where, as here, the defendant offers no

contemporaneous, non-retaliatory explanation for its conduct. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004).

184. The inference of causation is reinforced by evidence of pretext. M&T's closure letter was undated and unsigned, and it asserted "previous notification" that Bryan disputes ever receiving. That kind of unverifiable, shifting explanation supports an inference of pretext, and pretext in turn supports an inference of causation. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–47 (2d Cir. 2013).

185. The July 20, 2026 modification supplies a further and independent basis for inferring pretext. M&T justified that action solely by reference to Bryan's lack of a deposit account, a circumstance M&T created by closing his accounts without explanation. A defendant that relies on a condition of its own making has offered no legitimate explanation at all, and the assertion of such a justification is itself probative of retaliatory motive.

186. Connors personally participated in this retaliatory conduct. When Bryan sought an explanation for the closures, she refused to provide one, told him he needed to "handle this yourself," and was observed placing a telephone call shortly before a security guard approached him and threatened to involve the police. That direct participation subjects her to individual liability under Section 296(6), independent of M&T's liability as her employer. *See Tomka*, 66 F.3d at 1317. Defendants' conduct would deter a reasonable person from engaging in protected activity.

187. M&T violated N.Y. Exec. Law § 296(7), and Connors violated N.Y. Exec. Law § 296(6). Accordingly, Plaintiff is entitled to recover compensatory damages, including damages for emotional distress, and interest together with attorneys' fees, costs, and interest, against M&T and Connors, jointly and severally.

**COUNT IX – DISCRIMINATION IN CREDIT BASED ON RACE AND DISABILITY - NYSHRL § 296-A**
**Against Defendant M&T**

188.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

189.   M&T is a creditor, and Bryan is Black and disabled, within the meaning of N.Y. Exec. Law § 296-a. Section 296-a(1)(b) makes it an unlawful discriminatory practice for any creditor "[t]o discriminate in the granting, withholding, extending or renewing, *or in the fixing of the rates, terms or conditions of, any form of credit*," on the basis of race or disability, among other protected characteristics. N.Y. Exec. Law § 296-a(1)(b).

190.   In the further alternative, and to the extent any of Bryan's lines of credit related to the purchase, acquisition, construction, rehabilitation, repair, or maintenance of a housing accommodation, land, or commercial space, M&T's conduct also violated N.Y. Exec. Law § 296-a(1)(a), which reaches discrimination in the granting, withholding, extending, or renewing of such credit and in the fixing of its rates, terms, or conditions.

191.   The Human Rights Law is a remedial statute, to be construed broadly to accomplish its purpose of eradicating discrimination and making victims whole. *See Koerner v. State of New York*, 62 N.Y.2d 442, 448–49 (1984); *Matter of Aurecchione v. New York State Div. of Human Rights*, 98 N.Y.2d 21, 25–26 (2002); see also N.Y. Exec. Law § 300.   That remedial purpose is directly implicated here: M&T terminated existing lines of credit that Bryan had relied upon for years, not merely an application for new credit, and did so shortly after he engaged in activity protected by the NYSHRL.

192.   M&T's July 20, 2026 conduct falls squarely within the text of § 296-a(1)(b). By withdrawing the interest-only repayment terms on which Bryan had serviced his lines of credit and substituting an obligation to pay principal and interest, M&T engaged in "the fixing of the rates, terms or conditions of" an existing form of credit. Unlike the federal ECOA, which does

43

not reach disability, § 296-a expressly prohibits such conduct on the basis of disability as well as race, and Bryan alleges that both his race and his disability were motivating factors in M&T's decision.

193.    Section 296-a(2)(ii) independently deems M&T's conduct discriminatory. That provision states that, without limiting the generality of subdivision one, it shall be considered discriminatory if, because of an applicant's race or disability, "special requirements or conditions … are imposed upon an applicant or class of applicants in circumstances where similar requirements or conditions are not imposed upon other applicants of like overall credit worthiness." N.Y. Exec. Law § 296-a(2)(ii). M&T imposed on Bryan the special requirement of principal amortization, and conditioned his continued enjoyment of interest-only terms on his maintenance of a deposit relationship the Bank itself had terminated. Upon information and belief, M&T did not impose comparable requirements or conditions on other borrowers of like overall creditworthiness who are not Black and/or not disabled.

194.    Applying the same differential-treatment standard that governs Count VI, M&T treated Bryan less well than it had treated him for years, and less well than it treats similarly situated customers who are not Black and/or not disabled, with respect to the maintenance, modification, and closure of credit relationships. *See Mumin v. City of New York*, 760 F. Supp. 3d 28, 55 (S.D.N.Y. 2024). M&T did so without providing a specific, legitimate, non-discriminatory reason for terminating credit it had extended for years, while interfering with Bryan's ability to access, manage, and pay his outstanding obligations and continuing to demand payment on those same obligations while withholding basic information about them. Upon information and belief, Bryan's race and disability were motivating factors in M&T's decisions to close and to modify his credit lines.

195.   The statutory safe harbor in N.Y. Exec. Law § 296-a(3) does not apply. M&T's conduct was not based upon "factually supportable, objective differences in applicants' overall credit worthiness." M&T identified no change in Bryan's income, assets, or credit history as a basis for either the April 4, 2026 terminations or the July 20, 2026 modification, and his lines of credit were neither delinquent nor in default on either date. The absence of a deposit account is not a measure of creditworthiness, and in any event it was a circumstance of M&T's own making.

196.   To the extent M&T contends that Bryan was required to seek relief from the Superintendent of Financial Services, that contention fails. Section 296-a(6) provides that an aggrieved person "in lieu of" the procedure set forth in § 297 "may" file a verified complaint with the Superintendent. That route is permissive, not mandatory. Bryan has not filed any complaint concerning this matter with the Superintendent or with any local commission on human rights, and he is therefore free to pursue this claim in this Court under § 297(9).

197.   M&T violated N.Y. Exec. Law § 296-a, including §§ 296-a(1)(b) and 296-a(2)(ii). Accordingly, Plaintiff is entitled to compensatory damages, attorneys' fees and costs, and interest.

### COUNT X – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Against Defendant M&T

198.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

199.   Bryan's deposit accounts and lines of credit with M&T were governed by account agreements between him and M&T. Under New York law, every contract contains an implied covenant of good faith and fair dealing, including a bank's deposit account agreements. That covenant prohibits a party from exercising its contractual discretion arbitrarily, or in a manner

that destroys or injures the other party's right to receive the fruits of the contract. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153–54 (2002).

200.    That is true even where a contract affords one party broad or sole discretion. Such discretion still cannot be exercised for an illegitimate purpose or in bad faith as part of a scheme to deprive the other party of the benefits it bargained for. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302–03 (1st Dep't 2003).

201.    The implied covenant also embodies the prevention doctrine: "[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *Kooleraire Serv. & Installation Corp. v. Board of Educ. of City of N.Y.*, 28 N.Y.2d 101, 106 (1971). That doctrine "rests on an implied obligation under the contract not to frustrate or prevent the performance of the condition precedent." *HGCD Retail Servs., LLC v. 44-45 Broadway Realty Co.*, 37 A.D.3d 43, 53 (1st Dep't 2006).

202.    Even accepting that M&T's account agreements afford it broad discretion to close accounts, M&T did not exercise that discretion in good faith. It closed all of Bryan's personal and business accounts and credit lines without meaningful prior notice. It then sent him an account-closure letter that was undated and unsigned, did not identify who made the decision, and falsely represented that the closures were made "according to previous notification" that he disputes having received.

203.    When he sought an explanation in person, M&T's branch manager refused to provide one and told him to "handle this yourself." M&T's corporate office gave him no further information, and a security guard threatened to involve the police when he attempted to document the encounter. This pattern of arbitrary timing, a knowingly inaccurate closure letter,

and a categorical refusal to provide any explanation is the kind of bad-faith exercise of contractual discretion the implied covenant prohibits, regardless of how broad M&T's discretion to close accounts may otherwise be.

204.    M&T's July 20, 2026 conduct is a further and distinct breach. To the extent Bryan's continued enjoyment of interest-only repayment terms depended upon his maintaining a deposit relationship with M&T, that condition failed only because M&T unilaterally closed every deposit account he held, without his request or authorization, without meaningful notice, and without any stated reason. M&T thereby frustrated the very condition on which it now relies, and it cannot invoke the failure of that condition to justify imposing more burdensome terms on Bryan's existing credit. *Kooleraire*, 28 N.Y.2d at 106; *HGCD Retail Servs.*, 37 A.D.3d at 53.

205.    The sequence is itself the breach. M&T did not simply exercise a contractual right to close accounts and stop there. It took two steps, and the second depended entirely on the first. M&T closed every deposit account Bryan held, without his request, without his authorization, and without any stated reason. It then treated the resulting absence of a deposit relationship as grounds for withdrawing the interest-only repayment terms under the credit agreements it left in place. Bryan did nothing to bring about the condition on which M&T relied, and he could have done nothing to prevent it. The condition existed because M&T created it.

206.    Exercising discretion in that manner is the paradigm of bad faith the implied covenant forbids. A party may not use its discretion to manufacture the predicate for withdrawing a benefit and then charge its counterparty for the predicate it created. Whatever latitude M&T's account agreements gave it to close deposit accounts, that latitude did not include a right to convert the closures into a basis for imposing more burdensome terms on separate credit obligations that Bryan was performing. M&T identified no default, no missed payment, no deterioration in Bryan's financial condition, and no other change in circumstance to

47

justify the modification. The only circumstance that changed was one M&T brought about itself, and M&T then used it to deprive Bryan of the fruits of the credit agreements he had bargained for and serviced for years. *See Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995); Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 (1st Dep't 2003).*

207.    M&T's conduct deprived Bryan of the benefit of his banking relationship, including timely access to his own funds, the repayment terms on which he had serviced his credit obligations for years,  and the ability to rely on his accounts and credit lines to operate his businesses.

208.    M&T breached the implied covenant of good faith and fair dealing. Plaintiff is entitled to compensatory and consequential damages, interest, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mark Bryan respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

a.  On Count I, a declaratory judgment that Defendant M&T Bank's policies and practices, as applied to Plaintiff, violate Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq., and a permanent injunction directing M&T to make reasonable modifications to its policies, practices, and procedures to accommodate Plaintiff's disability-related need for restroom access at its Great Neck branch;

b.  On Count II, a declaratory judgment that Defendant M&T Bank violated the ADA's anti-retaliation and interference provisions, 42 U.S.C. § 12203(a) and (b), and a permanent injunction restraining M&T from retaliating against or interfering with Plaintiff because of his exercise or enjoyment of rights protected by the ADA, including an injunction directing M&T to rescind the July 20, 2026 modification of Plaintiff's lines of credit and to restore the repayment terms in effect before that date;

c.  On Count III, a declaratory judgment that Defendant M&T Bank violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; compensatory damages for Plaintiff's provable economic injuries, including loss of access to funds and credit, out-of-pocket costs of obtaining replacement banking and credit services, increased financing and repayment

costs, damage to his personal and business credit, business interruption, lost profits, and lost business opportunities; a permanent injunction directing M&T to make reasonable modifications to its policies, practices, and procedures to accommodate Plaintiff's disability-related need for restroom access at its Great Neck branch and to cease retaliating against or interfering with him; and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 794a(b);

d.  On Count III, compensatory damages against Defendants M&T Bank and Eileen Connors, jointly and severally, for race discrimination and retaliation in violation of 42 U.S.C. § 1981, including damages for emotional distress, loss of access to funds and credit, business interruption, lost profits, increased financing costs, damage to personal and business credit, lost business opportunities, and other consequential financial losses;

e.  On Count III, punitive damages against Defendants M&T Bank and Eileen Connors, jointly and severally where permitted by law, in an amount sufficient to punish Defendants and deter similar conduct;

f.  On Count IV, actual damages against Defendant M&T Bank for race discrimination in credit transactions in violation of 15 U.S.C. § 1691(a)(1), including damages arising from the termination or revocation of Plaintiff's existing lines of credit, the July 20, 2026 unfavorable modification of the terms of those lines of credit, the resulting increase in Plaintiff's periodic debt-service obligations, loss of access to credit, increased financing costs, damage to Plaintiff's personal and business credit, business interruption, lost profits, lost business opportunities, and other consequential financial losses;

g.  On Count V, actual damages against Defendant M&T Bank caused by its failure to provide a timely and compliant notice of adverse action in violation of 15 U.S.C. § 1691(d) and Regulation B, as to both the April 4, 2026 termination of Plaintiff's lines of credit and the July 20, 2026 modification of their terms, including damages arising from Plaintiff's inability to timely understand, challenge, correct, or mitigate the termination or revocation of his lines of credit, together with appropriate declaratory and equitable relief;

h.  On Counts IV and V, punitive damages against Defendant M&T Bank in a single amount not exceeding the statutory maximum permitted under 15 U.S.C. § 1691e(b), together with such other declaratory and equitable relief as is necessary to enforce M&T's obligations under the ECOA and Regulation B;

i.  On Counts VI and VII, compensatory damages against Defendants M&T Bank and Eileen Connors, jointly and severally where applicable, including damages for emotional distress, humiliation, loss of access to funds and credit, business interruption, lost profits, increased financing costs, damage to personal and business credit, and other consequential losses;

j.  On Count VIII, compensatory damages against Defendant M&T Bank for discrimination in credit transactions in violation of N.Y. Executive Law § 296-a, including §§ 296-a(1)(b) and 296-a(2)(ii), including damages for loss of access to credit, the withdrawal of favorable repayment terms and resulting increase in periodic debt service, increased financing costs,

49

damage to Plaintiff's personal and business credit, business interruption, lost profits, lost business opportunities, and other consequential financial losses;

k.  On Count IX, compensatory and consequential damages against Defendant M&T Bank for breach of the implied covenant of good faith and fair dealing, including damages arising from Plaintiff's loss of access to his funds, deposit accounts, and credit relationships, the loss of his interest-only repayment terms, his approximately $30,000 net loss arising from the failed real-estate transaction, his approximately $22,500 in lost business profits, and such other damages as may be established at trial;

l.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 12188(a), 12203(c), and 12205; 42 U.S.C. § 1988; 29 U.S.C. § 794a(b); 15 U.S.C. § 1691e(d); N.Y. Executive Law § 297(10); and all other applicable provisions of law;

m.  Prejudgment and post-judgment interest as permitted by law; and

n.  Such other and further relief as the Court deems just and proper.


## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.


Dated:        Huntington, NY
              July 31, 2026


                          **TA LEGAL GROUP PLLC**
                          *Attorneys for Plaintiff Bryan*


              By:    _____
                          Taimur Alamgir, Esq.
                          Matthew J. Daidola, Esq.
                          205 East Main Street, Suite 3-2
                          Huntington, NY 11743
                          (914) 552-2669
                          (631) 942-7399
                          tim@talegalgroup.com
                          matthew@talegalgroup.com

                          50